# AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS

I, David Clements, Task Force Officer, United States Department of Justice, Drug Enforcement Administration, being duly sworn, do declare and state as follows:

1. I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") and has been so since August, 2016. As a TFO, I am charged with the duty of enforcing the Controlled Substances Act, and other duties imposed by law, and authorized under Title 21, United States Code, Section 878 to carry firearms, execute warrants, make arrests for offenses against the United States of America, and to perform other law enforcement duties as authorized by law. Your Affiant is currently assigned to a Tactical Diversion Squad ("TDS") within the DEA's Washington Division, where your Affiant's duties include, but are not limited to, the investigation of prescription drug diversion, prescription drug distribution and doctor shopping.

2. Your Affiant completed a twenty-two (22) week basic law enforcement training program provided by the Commonwealth of Virginia, Department of Criminal Justice Services, and served as a Police Officer with the City of Buena Vista, Virginia, before being assigned to the Rockbridge Regional Drug Task Force. Your Affiant has been certified law enforcement for seven (7) years and Investigator for the last 5 years. In that capacity, your Affiant's duties include the investigation of narcotic cases, including assisting with general investigations. In August, 2016, your Affiant was deputized as a TFO with the DEA. Your Affiant has received special training in drug identification and drug diversion methods from various local, state and federal law enforcement and regulatory agencies. Additionally, your Affiant has also received specialized training in the preparation and execution of criminal complaints, arrest warrants and search warrants. Your Affiant has previously prepared search warrants while working with the Buena Vista Police Department.

3. During my employment as a DEA TFO, I have participated in numerous investigations involving the seizure of controlled substances, the seizure of narcotic related records and other types of evidence that document a criminal organization's activities in both the manufacturing and distribution of controlled substances.

1

4. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance and various types of informants and cooperating sources. Through these investigations, my training and experience, and conversations with other experienced Agents and law enforcement personnel, I have become familiar with statutes and regulations that govern the handling (i.e. ordering, possessing, manufacturing, distributing, prescribing, dispensing, administering, importing and exporting) of controlled substances by DEA registrants, those individuals or entities authorized by statute to handle controlled substances. Moreover, I am familiar with the modus operandi of DEA registrants who, independently or in concert with others, abuse their authority in a manner that controlled substances are ultimately diverted from the legitimate system of distribution to the illicit market. Often, such diversion occurs from an ostensibly legitimate business or businesses by complicit registrants and/or complicit employees of registered individuals or entities. In cases involving medical clinics, I know that these diversion schemes involve: the use of telecommunications devices for oral and/or typed messaging between or among participants of the scheme; the movement of U.S. Currency by cash transactions and electronic transfers between accounts; and fraudulent aesthetics to present a façade of a legitimate business. Such aesthetics may include: requesting and maintaining medical documentation and history, which may be outdated, false, or is not reviewed or used in "treatment" decisions; maintaining paper or electronic patient files, which contain false reporting of client visits, diagnostic testing, and in which notes are often copied from previous visits; and dressing staff in medical scrubs, despite staff not being medically trained, certified, or licensed.

5. This affidavit is based upon my personal knowledge and participation in an ongoing drug and money laundering investigation and the personal knowledge and participation of other experienced law enforcement officers participating in this investigation.

## INTRODUCTION

6. There is probable cause, based on information contained in this affidavit, to believe that Joan M. RESK, DO is operating businesses and/or managing bank accounts in furtherance of a crime of possessing with the intent to distribute controlled substances (namely oxycodone) in violation of Title 21, United States Code, Sections 841(a)(1), and to commit money laundering in

violation of Title 18, United States Code, Sections 1956(a)(1) and 1956(h). RESK has used her residence at 6700 Back Creek Rd. Boones Mill, VA and her business location at 5303 Clearbrook Village Ln. Roanoke, VA to distribute controlled substances (namely Oxycodone) in violation of Title 21, United States Code, Section 841(a)(1). Further, information in this affidavit will establish there is probable cause to believe RESK has used both her residence and former business location to commit money laundering in violation of Title 18, United States Code, Section 1956(a)(1) and 1956(h).

7.   As used in this affidavit and pursuant to Title 21, United States Code, Section 812 and Title 21, C.F.R. Section 1308.12(b), oxycodone is a Schedule II controlled substance. Oxycodone is marketed under the brand names of Oxycontin, Percocet, Endocet, Roxicet, OxyIR, and Oxyfast, as well as numerous generic combinations.

8.   From my experience with investigations involving illicit distribution and uses of pharmaceutical drugs, I know that the above-described controlled substances are presently highly subject to abuse and are available in the illicit marketplace, not only in the Western District of Virginia, but also throughout the United States.

9.   As used in this affidavit and pursuant to Title 21, C.F.R., Section 1300.01 (35), the term "prescription" is an order for medication dispensed to or for an ultimate user, but does not include an order for medication that is dispensed for immediate administration to the ultimate user. As further used in this affidavit and pursuant to Title 21, C.F.R., Section 1306.04(a), "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his/her professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is imposed primarily on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, sVH be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

3

10. I believe, based on the information set forth, that searches of the following locations, collectively referred to as "TARGET PREMISES," will lead to evidence, fruits, and instrumentalities of the aforementioned crimes, as well as to the identification of individuals who are engaged in the commission of those crimes:

- 5303 Clearbrook Village Ln. Roanoke, VA. 24112.
- 6700 Back Creek Rd. Boones Mill, VA. 24065
- 6701 Back Creed Rd. Boones Mill, VA. 24065

11. Not all of the facts of the investigation known to me are contained herein; rather, only those facts necessary to establish probable cause for the searches of the above-listed locations have been included.

12. Beginning in or about January 2017, investigators assigned to the Roanoke Resident Office ("RRO") TDS received information that RESK was seeing patients in the kitchen of her personal residence located in the vicinity of 6700 Back Creek Rd. Boones Mill, VA. Specifically, investigators received information that RESK was willing to write any prescription to patients who will pay $200 in cash to her.

### Initial Interview of CS 1

13. On July 6, 2017, CS 1 spoke with members of the RRO TDS about his/her experiences as a patient of Dr. Joan RESK. CS 1 first explained that he/she had previously failed out of a pain clinic after testing positive for Suboxone on a drug screen. CS 1 stated that he/she then heard about RESK from a friend and that RESK was, at that time, taking new patients.

14. CS 1 stated that he/she had been a patient of RESK since approximately 2012. CS 1 explained that RESK had; before his/her first visit, gotten in trouble for insurance fraud, and that RESK only accepted cash for payment. CS 1 stated that the initial visit cost $850 and that CS 1 provided RESK with all his/her medical records during the first visit. CS 1 remembered that RESK took blood for lab work and conducted an EKG, but stated that RESK did not conduct any

other exam or manipulate any of the CS 1's problem areas.[1] CS 1 explained that RESK provided CS 1 with prescriptions for Oxycodone 30 mg and OxyContin 80 mg on the initial visit.

15. CS 1 stated that he/she had attended appointments with RESK at her clinic, which was located in Clearbrook, until sometime in 2016. CS 1 stated that in 2016, patients were told to come to RESK's residence in Boones Mill. CS 1 stated that he/she had previously paid $195 in cash for visits at the Clearbrook location and that RESK increased her fees to $250 once she (RESK) started seeing patients at her house.

16. CS 1 stated that, at the residence in Boones Mill, RESK would see patients at the kitchen table. CS 1 stated that RESK often would come in from the barn, wearing dirty cloths and conduct patient visits. CS 1 stated that a visit lasted approximately fifteen minutes. CS 1 explained that RESK had a limited schedule. RESK allowed patients to show up on Mondays and Fridays. CS 1 explained that RESK saw patients between 9:00 AM and 12:00 PM, but that RESK required that patients arrive to her driveway by 10:00 AM in order to be seen.

17. CS 1 stated that RESK kept, at least some, patient files in a room at her (RESK's) residence. CS 1 was unsure if any patient documentation was still kept at the clinic in Clearbrook. CS 1 stated that from, time to time, RESK conducted bloodwork and that RESK continued to utilize the clinic to draw blood samples. CS 1 explained that RESK would ask patients to meet at the clinic on these instances and that upon arrival, RESK would draw the needed samples and then the patient would leave.

18. CS 1 stated that for around two months, RESK had been having patients provide urine screens at a facility in Salem, Virginia. CS 1 stated that he/she did not remember the name of the facility but knew the number to that office was 540-524-2822.[2] CS 1 explained that RESK had also recently began to use a computer to determine if patients were receiving prescriptions from other physicians. CS 1 stated that RESK seems paranoid due to new laws and had recently cut CS 1's prescriptions in half.

---

[1] CS 1 had previously explained that he/she experienced pain stemming from surgical procedures on his/her back, neck, and hand.
[2] Investigation shows that 540-524-2822 is the number for Arcpoint Labs located in the vicinity of 1627 E. Main Street, Salem, Virginia.

5

19. CS 1 expressed that it has become difficult to find a pharmacy which would fill prescriptions written by RESK. CS 1 stated that only three pharmacies continued to fill RESK's prescriptions: Cundiff's in Vinton, Krogers and Wal-Mart. CS 1 also explained that patients were not allowed to file insurance claims. If RESK found out that they had, CS 1 stated that RESK would dismiss them as a patient.

20. CS 1 stated that he/she knew that some of RESK's patients abused and sold pharmaceuticals prescribed by RESK.

### CS 1 Visit to Dr. Joan RESK at 6700 Back Creek Rd. Boones Mill, Virginia

21. On August 14, 2017, CS 1 met with members of the RRO TDS for the purpose of having CS 1 visit RESK at 6700 Back Creek Rd. Boones Mill, Virginia for the CS1's monthly visit. CS 1 was searched and provided recording devices and U.S. currency at the briefing location. CS 1 was driven to RESK's residence by TFO Anita Sowers acting in an undercover capacity (further UC). CS 1 and the UC arrived in the vicinity of 6700 Back Creek Rd. Boones Mill, Virginia at approximately 9:27 AM and both the UC and CS 1 returned to the debriefing location at approximately 10:38 AM.

22. Both the UC and CS 1 were debriefed after the UC was searched and the recording devices were transferred to TFO Clements. CS 1 also provided a prescription to SA Joshua Rogers which CS 1 stated was obtained from RESK during the operation. The following information was stated in substance and not verbatim, and is intended to be a summary of CS 1's encounter with RESK.

23. CS 1 stated that he/she entered the residence at 6700 Back Creek Rd. Boones Mill, Virginia upon arrival. CS 1 stated that the UC had remained in the UC vehicle. CS 1 stated that he/she was met at the front door by RESK and ushered to the dining area of the house. CS 1 stated that he/she and RESK had a brief conversation around the kitchen table. CS 1 stated that the conversation had been about RESK's dog and a television show that RESK had been watching

6

prior to CS 1's arrival. CS 1 explained that RESK left the room briefly and returned with a file which RESK referred to as CS 1's records.

24. CS 1 stated that RESK then had CS 1 follow her to the garage. There the two sat in a Kawasaki Mule[3]. RESK then drove herself and CS 1 up a hill to barn where CS 1 stated RESK conducted a manipulation. CS 1 stated that, inside the barn, RESK had CS 1 lie on a table covered by a horse blanket while RESK manipulated his/her shoulder and neck. CS 1 stated that he/she had not been in the barn for more than fifteen (15) minutes and that he/she then walked back down the hill to the house. CS 1 stated that RESK drove the Kawasaki Mule back to the garage and met CS 1 at the house.

25. CS 1 stated that, once back in the kitchen, he/she and RESK discussed payment for the visit. CS 1 stated that RESK charged him/her $200 for the manipulation and $250 for the normal visit for a total of $450 which CS 1 then paid to RESK.[4]

26. CS 1 stated that RESK agreed to see CS 1 in approximately three (3) weeks for another visit.[5] Per CS 1, RESK then checked CS 1's prescription activity via the prescription monitoring system. CS 1 stated that RESK inquired about a certain pharmacy that CS 1 had utilized. CS 1 was then provided a prescription for Oxycodone HCL 15 mg, a quantity of seventy-five (75). CS 1 also stated that RESK reiterated the importance to return for the next appointment near the beginning of September. RESK stated that she was attempting to position patients appointments then so that she (RESK) could go on vacation later in the month.

27. The UC stated that she had observed CS 1 walk towards the residence at 6700 Back Creek Rd. upon arrival. The UC stated that CS 1 and RESK appeared from inside the garage and drove past her (the UC), up a hill, and out of sight. The UC stated that she observed CS 1 walking down the hill and back into the residence before seeing RESK return via a Kawasaki Mule. The UC stated she and RESK had a brief conversation before she (RESK) drove back into the garage and out of sight.

---

[3] A Kawasaki Mule is a side by side all-terrain vehicle.
[4] CS 1 paid RESK utilizing funds previously provided to CS 1 by TFO Clements at the initial briefing location.
[5] CS 1 stated that it was normal for RESK to tell him/her a time frame to come back and did not typically set appointments. CS 1 stated that RESK only accepts patients on Monday and Friday mornings.

## ATTEMPT TO OBTAIN CS 1 PATIENT FILE FROM RESK

28. On September 6, 2017, CS 1 received a voicemail from RESK informing CS 1 that RESK intended to give up her medical license and retire. CS 1 had a scheduled appointment with RESK on September 8, 2017 and RESK informed CS 1 in the voicemail that the September 8th appointment would be cancelled. CS 1 informed TFO Sowers directly after receiving the voicemail and CS 1 agreed to meet with TFO Sowers and TFO Clements the following day.

29. On September 7, 2017, CS 1 met with TFO Sowers and TFO Clements for the purpose of recording a phone call between CS 1 and RESK. The purpose of the phone call would be for CS 1 to request CS 1's patient file from RESK. During the call, RESK informed CS 1 to request his/her patient file in writing via mail. RESK made a statement that she had fifteen (15) days to provide the records to CS 1 after receiving the written request. RESK informed CS 1 that she (RESK) would contact CS 1 the following week after receipt of the written request.

30. On September 22, 2017, SA Rogers and TFO Clements met with CS 1 at a neutral location. CS 1 explained that he/she had sent a letter via United States Postal Service to RESK on September 11, 2017. CS 1 had not received a response from RESK and stated that he/she had not communicated with RESK since placing a phone call to RESK on September 7, 2017.

31. On October 11, 2017, TFO Sowers and TFO Clements met with CS 1 for the purpose of recording a phone call between CS 1 and RESK. The purpose of the call was for CS 1 to inquire about the letter CS 1 had sent to RESK requesting his/her patient file. CS 1 dialed (540) 776-8331 and RESK accepted the call. During the call, RESK stated that she had not received any request for records. RESK explained that CS 1 would need to resubmit the request and mail it to RESK's personal residence at 6700 Back Creek Rd. Boones Mill, Virginia. CS 1 acknowledged to TFO Clements and TFO Sowers that the previous letter had been sent to 5303 Clearbrook Village Ln. Roanoke, Virginia.[6]

---

[6] 5303 Clearbrook Village Ln. Roanoke, Virginia is the location of RESK's practice. At the time of the phone call a large "For Sale" sign was placed in the front lawn area of the property and visible from Rt. 220. The sign provided a contact number of (540) 776-8331 which is the known number for RESK and the number CS 1 utilized to contact RESK.

32. On November 13, 2017, CS 1 met with RRO TDS members for the purpose of sending CS 1 to RESK's residence in an attempt to obtain a copy of CS 1's patient file. CS 1 provided a letter to TFO Sowers which CS 1 had received from RESK. CS 1 stated that the letter was the same one that he/she had sent to RESK after the October 11, 2017 phone call was placed to RESK. CS 1 pointed out that RESK had hand written a response beneath the original request. The following is RESK's response contained in the letter:

*Oct 23*

*Please specify exactly what records that you would like. There is a fee due and payable for each page. I also need your signature on the request and not that of another. I await your written reply with date of birth, signature, etc. Your records are extensive.*

*Joan M. Resk, DO*

33. At approximately 9:50 AM, on the morning of November 13, 2017, CS 1 and TFO Sowers acting in an UC capacity arrived at 6700 Back Creek Rd. Boones Mill. CS 1 attempted to make contact with RESK at the residence but was unable to hail anyone to the exterior door of the residence. CS 1 returned to the UC vehicle with UC Sowers and attempted to call RESK. The call was sent to voicemail and CS 1 ended the call without leaving a message.

34. On December 8, 2017, TFO Sowers, GS Christopher Dziedzic, and SA Rogers met CS 1 for the purpose of having CS 1 call RESK to follow up regarding CS 1's request to obtain his/her patient file. CS 1 made a recorded call to (540) 776-8331 at approximately 10:22 AM and spoke with RESK. RESK informed CS 1 that RESK was unsure of what the fee would be for the documents. RESK informed CS 1 that it will cost at least twenty-five (25) cents per page and that the CS-1 would need to pay a handling fee, copying fee, and mailing fee for the records. RESK informed CS 1 to call back at a later date to schedule an appointment to receive the records after CS 1 had the funds to pay for the associated fees.

35. On December 19, 2017, CS 1 stated that he/she received a phone call from RESK, calling from a private number. CS 1 explained that RESK stated during the call, that CS 1 could come by RESK's residence on December 20, 2017 and obtain CS 1's patient file.

36. On December 20, 2017, CS 1 met with members of the RRO TDS for the purpose of having CS 1 obtain his/her patient file from RESK. TFO Sowers, acting in a UC capacity, then drove CS 1 to 6700 Back Creek Rd. Boones Mill. At approximately 9:37 AM, TFO Sowers and CS 1 arrived. CS 1 met with RESK and attempted to obtain copies of CS 1's patient records. RESK first stated that she thought that CS 1 was coming to obtain the records on December 21, 2017, and was not prepared to provide them at the current time. RESK stated that she had an appointment scheduled and that CS 1 could obtain the records after the appointment if CS 1 was willing to wait.

37. On December 20, 2017, at approximately 9:40 AM, a silver Ford SUV with Virginia license plate ▮▮▮▮▮▮▮[7] arrived at 6700 Back Creek Rd. The UC observed a female exit the vehicle and enter the residence at 6700 Back Creek Rd. At approximately 10:09 AM, the female returned to the vehicle and left the area, as observed by the UC.

38. After the silver Ford left the area, CS 1 returned inside the residence. At approximately 10:40 AM, CS 1 returned to the UC vehicle driven by the UC. CS 1 had obtained paperwork from RESK. CS 1 stated that the papers obtained, had previously been provided to RESK by CS 1. CS 1 stated that RESK explained her copier was malfunctioning and was only able to make copies of the paperwork, which CS 1 was provided during the meet. RESK explained to CS 1 to come back at a later date if the provided documents were insufficient to establish a new primary care physician.

## INTERVIEWS OF FORMER PATIENTS OF DR. JOAN RESK
### Interview of PW on February 8, 2018

39. On February 8, 2018, TFO Clements, TFO Sowers, and SA JamesTerpening interviewed PW at her residence regarding her time as a patient of RESK. PW stated that she had experienced pain resulting from surgery to fix a "blown disc" in her back, as well as, from arthritis in her hips, chronic obstructive pulmonary disease and fibromyalgia. PW stated that she

)

---

[7] Virginia license ▮▮▮▮▮ is registered to A▮▮▮ T▮▮▮, and J▮▮▮ M▮▮▮, and on a 2016 Ford SUV, silver in color, and housed at ▮▮ Laurel Mountain Dr, Salem, VA. 24153.

became a patient of RESK after stopping by RESK's practice in Clearbrook and RESK telling PW to return the following day with $350 in cash.

40. PW stated that RESK did not accept insurance and would only take cash as payment. PW recalled paying anywhere from $250 to $1250 for an appointment. PW expressed that she believed RESK's intent was to sell prescriptions and that she thought RESK was a "crooked doctor." PW explained that RESK provided her a prescription for 30 MG Oxycodone from the first visit. PW explained that such a high dose made her feel sick and that she later asked RESK to lower the MG per pill. PW stated that RESK refused to do so for some time and told PW that she would not tell her (RESK) what to do.

41. PW detailed an experience where RESK asked PW to come in a few days early for an appointment, due to the fact that RESK would be on vacation during the day PW's appointment was scheduled. PW explained that RESK demanded $350 at the beginning of the advanced appointment and then explained that she (RESK) had misread the calendar, and that RESK would be back in time to provide a prescription before PW's current medication should run out. PW stated that RESK refused to provide a prescription and had her (PW) return after RESK's vacation.

42. PW stated that she knew RESK to pay people in prescriptions. PW said that RESK had offered her and PW's boyfriend "Ricky" prescriptions if they would perform work on a deck that RESK needed to have redone at her residence. PW stated that she knew of other patients who had received prescriptions for painting the white board fence that borders RESK's driveway.

43. PW explained that approximately seven months prior to ending her relationship as a patient of RESK's that RESK had her and other patients attend appointments at RESK's residence. PW explained that RESK had told her not to enter the house if another vehicle was in the driveway, and to wait in her vehicle until every other vehicle left. PW explained that RESK would then see her at her dining room table. They would have a brief conversation and then RESK would issue a prescription after she was paid. PW stated that she had stopped going to RESK because she (PW) was uncomfortable receiving a prescription after RESK never performed any tests on her.

11

PW added that on one occasion, RESK took her money and handed her a prescription for Oxycodone without asking a question of her.

## Interview of SH and VH on February 8, 2018

44. On February 8, 2018, TFO Clements, TFO Sowers, and SA Terpening interviewed SH and VH about their time as patients of RESK. VH and SH are married and began going to RESK because they heard that RESK would prescribe anything to them for $200 in cash. VH stated that SH attended approximately two visits prior to his first visit with RESK and the two estimated that they were patients of RESK for between three and four years.

45. VH and SH explained that RESK would not prescribe them Oxycodone until they had X-rays taken and paid the subsequent $600 fee to RESK. The two explained that RESK conducted the X-rays on the second or third visit and that RESK prescribed Lortab, prior to obtaining the X-ray. The two stated that after the X-rays were completed that RESK prescribed them 30 mg Oxycodone. SH explained during the interview that RESK would only accept cash and did not take insurance. SH stated that RESK was no different from a drug dealer on the street and explained that she and VH had paid between $200 and $1,000 for visits to RESK.

46. VH and SH expressed that they often would "get sick" prior to their appointments. The two clarified that they felt ill because of withdrawal symptoms that were a result of being dependent on the Oxycodone. The two recalled asking RESK to prescribe them to Suboxone to help them cope with their dependence to the oxycodone, and that RESK refused to do so.

47. VH and SH acknowledged that visits to RESK began at her practice located in Clearbrook, but eventually were told to attend appointments at RESK's residence. VH and SH explained that a typical appointment involved answering a few questions and then receiving a prescription. The two noted that payment was expected prior to sitting down for their appointment. SH stated that RESK continued to utilize the Clearbrook facility to facilitate blood draws. SH and VH also stated that a visit at RESK's residence required them to wait in the driveway until their turn. They stated that RESK would then have them sit at the dining room table where she would issue them their prescription.

12

-47A) RESK last utilized her medical office on Clearbrook Village Lane on our about the fall 2017. Your Affiant and DEA Special Agent Joshua Rogers last visited the medical offices of RESK at 5303 Clearbrook Village Lane, Roanoke, VA on March 15, 2018 and observed what appeared to be patient medical files. Virginia law requires physicians to keep patient medical files for a period of six (6) years after the last patient visit.



MMB
4/20/2018

48. SH did remember one occasion at RESK's residence, where she (SH) was taken to a horse barn located on the property. SH said that RESK performed a manipulation on her in the barn. SH described the barn as having two dry walled offices, one of which possessed a table from RESK's Clearbrook office. SH stated that the rooms were clean but that equestrian supplies were scattered around the rooms.

49. SH stated that she experienced some pain but not enough to justify the intensity and amount of medication that RESK prescribed her. Both VH and SH stated RESK became cautious over the past few months of their time as her patients. The two stated that RESK had them sign waivers to have pill counts performed and that RESK began sending them to have urine screens. VH stated that he failed a drug screen and that RESK discontinued both VH and SH as patients. SH noted that RESK told them they could come back once VH provided a clean urine sample. The two stated that they took the opportunity to get off the medication altogether.

## Interview of MK on February 9, 2018

50. On February 9, 2018, TFO Sowers and SA Rogers interviewed MK. MK stated that she was a patient of RESK's from approximately February 2016 to November 2016 and had started seeing RESK after a recommendation by JP. K█ stated that JP was her (MK's) boyfriend at the time. MK stated that she had attended appointments to RESK's business in Clearbrook and later at RESK's residence in Boones Mill. MK stated that RESK charged $200 in cash for prescriptions.

51. MK detailed a visit to see RESK by explaining that RESK often did not perform any tests or checks prior to issuing a prescription for 90 15mg Oxycodone tablets. MK explained that RESK made her provide X-rays and previous medical records but failed to do any kind of thorough examinations after receiving the initial records. MK stated that once she started attending appointments at RESK's residence, RESK would simply receive payment and issue a prescription.

13

52. MK stated that she terminated her relationship as a patient of RESK's after observing multiple people arrive for appointments in a single vehicle, which MK explained appeared to be drug dealers and addicts. MK stated that RESK had also wanted MK to attend an appointment at the barn located on RESK's property. MK explained that RESK wanted $400 for the treatment MK would receive in the barn and that she had refused to go forward with the treatment.

53. MK explained that she was no longer on any medication because she did not need treatment for pain. MK also added that she believed that RESK only wanted money and did not counsel patients about addiction or attempt to lower patient's medication.

## Interview of J██ H██ on February 9, 2018

54. On February 9, 2018, TFO Sowers and SA Rogers interviewed JH who was known to have been a patient of RESK. JH explained to investigators that he (JH) had seen RESK for approximately three years but had stopped in October 2016 because problems that taking the medication RESK prescribed had created with his family. JH also noted that he felt that he was addicted to the pills that RESK prescribed, which at the time was 120 30mg Roxicodone. JH stated that RESK had started him off on 90 doses a month but soon after increased his prescription to consistently being 120 tablets.

55. JH explained that a friend named JL referred her to see RESK. JH stated that JL had died approximately two years ago and believed that the cause of JL's death was from an overdose of the medication that RESK had prescribed to JL. JH went on to say that, he experienced pain in his wrist which was the result of several surgeries taking place on or near that area.

56. JH stated that he always paid cash for his appointments to see RESK. JH explained that an appointment cost anywhere between $200 and $600 in cash. JH believed that RESK had accepted credit cards while she was practicing at her Clearbrook Office but stated that he had never attempted to use a credit card. JH stated that RESK took blood draws approximately every three months and that these visits cost JH $600[8]. JH explained that a typical visit consisted of

---

[8] JH stated that RESK did not employ any other staff and would conduct the blood draws herself.

14

him paying RESK and then RESK issuing JH a prescription for Roxicodone of his visits to RESK.

57. JH stated that approximately the last ten (10) visits to RESK occurred at RESK's residence. JH stated that these visits lasted between five (5) and ten (10) minutes and consisted of JH paying RESK for the visit and RESK issuing JH a prescription. JH explained that he would sit at RESK's kitchen table during his time at RESK's residence. JH also explained that he knew RESK to maintain patient records at the residence.

## ANALYSIS OF RESK'S PRESCRIPTION DATA

58. During the course of this investigation, TDS personnel have obtained raw data for controlled substance prescriptions filled in Virginia and prescribed by RESK between the dates of January 1, 2015 and July 31, 2017, which indicated that approximately 595 controlled substance prescriptions issued or authorized by RESK were filled. Among the prescriptions, approximately 80% (or 478) were issued for Schedule II controlled substances, 20% (119) were written for Schedule IV controlled substances.

59. Of the Schedule II prescriptions filled, 466 (or 78% of the total 595) were issued for oxycodone products and 7 (1%) were issued for hydrocodone products. Based on training and experience, your Affiant knows that oxycodone and hydrocodone are desirable drugs of choice for illegitimate recreational use and are a commodity in the illicit market.

## INTELLIGENCE OF DEPARTMENT OF HEALTH PROFESSIONALS INVESTIGATIONS

60. Through the course of this investigation, DEA agents were made aware that RESK had been under investigation on several occasions by the Department of Health Professionals (DHP). The DHP inquiries were obtained via grand jury subpoena by the United States Attorney's office in Roanoke, Virginia and provided to DEA agents via court order.

61. On several occasions RESK informed DHP that patient records were missing or lost. RESK provided explanations such as changing phone/internet companies and that on another occasion records had been damaged during a flood.

## DHP CASE # 174141

62. The most recent DHP investigation was initiated by Robert Shafer, MD[9] after Shafer observed SF appeared to be "disheveled and slightly intoxicated"[10] upon arrival to a surgery that Shafer provided anesthesia for. Shafer feared that SF had been impaired from the strength and amount of oxycodone prescribed to SF by RESK.

63. During the course of the DHP investigation, RESK provided patient file, which RESK had maintained from encounters with SF. Within the file are notes and documentation of SF's appointments with RESK and assessments made by RESK from these appointments. RESK on several occasions notes that SF is a drug seeker and believes that SF is addicted to the pain medication, which RESK prescribes.

64. RESK's records for SF detail twenty-one (21) encounters between RESK and SF. A large portion of the notes and information within the file appears to be repeated or "copy and pasted" from one encounter to the next. It should also be noted that RESK provided a portion of the records to DHP on February 16, 2017, after previously submitting a patient chart for SF, and stated that she had found the records "separated from [SF's] chart."[11]

65. RESK's records indicated that SF became a patient of RESK's on October 12, 2015. SF detailed a previous motorcycle accident and explained that medication received from the hospital was going to run out. RESK noted that SF arrived in a wheel chair and provided SF with a prescription for eighty-eight (88) oxycodone HCL 30mg.[12] RESK made no note of any assessment or diagnosis and ordered SF to provide recent medical records to RESK.

---

[9] Robert Shafer, MD is an Anesthesiologist working with Anesthesia Consultants of Virginia, Inc.
[10] DHP Case #175141 pg. 251
[11] DHP Case #175141 pg. 251
[12] Prescription monitoring notes this was for a twenty-two (22) day supply.

66. The second encounter that RESK details with SF explained that SF walked into the office, the encounter made no mention of SF having trouble with either leg. RESK also notes that SF went "THROUGH 37 DAYS OF PAIN MEDS IN ONLY 22 DAYS."[13] RESK provides no prescription on this date and mentions that SF had abused her medication. RESK also plans to perform a blood draw on the following visit.

67. Encounter three (3) occurred on November 9, 2015 and denotes that SF is seeing RESK "FOR LAB DRAW ONLY"[14] SF, per PMP information, filled a prescription for sixty (60) oxycodone HCL 30 mg[15] on November 9, 2018 which had been prescribed by RESK. The encounter notes a plan to obtain medical records.

68. Future encounters between RESK and SF indicated that SF never provides blood for lab work. RESK eventually notes that SF's veins are difficult to obtain a blood draw after SF indicated that she has attempted to have blood drawn at an independent laboratory. SF appears to have provided a limited number of medical records, but RESK notes that nothing regarding SF's recent medical history had been provided and that "I CANNOT BELIEVE HER WITHOUT RECORDS."[16] RESK also makes several notes and as recent as an encounter with SF occurring on April 22, 2016, that SF had provided no medical record that detailed the reason for SF's complaint or experience of pain.

69. On several occasions, RESK mentions that SF will not be provided future prescriptions without obtaining lab work or medical records. For instance, SF simultaneously had been prescribed pain medication from her orthopedic doctor while also received pain medication from RESK. RESK notes RESK informed SF to stop filling pain medication from other physicians on multiple encounters. RESK also makes note that SF is abusing her medication but continues to prescribe oxycodone to SF. RESK states on January 2, 2016, encounter seven (7), that she "Informed her [SF] that this time she is definitely abusing her meds."[17] RESK in the same note

[13] DHP Case 175141 pg. 99
[14] DHP Case 175141 pg. 102
[15] 15 day supply
[16] DHP Case 175141 pg. 131
[17] DHP Case 175141 pg. 115

stated that SF asks to have medication increased, which RESK denied after lecturing SF on the need to take the necessary time that SF's body needs to recover.

70. RESK's eighth encounter with SF occurred on January 16, 2016, and resulted in RESK increasing SF's medication from oxycodone 15 mg to oxycodone 30 mg in an effort to allow SF to "push on her recovery."[18] RESK further increased SF's medication on February 20, 2016, by prescribing both 30 mg and 15 mg oxycodone at once. This increase occurs after RESK notes that SF's chief complaint is that a screw, which had been placed in SF's right femur had backed out. RESK contradicts herself on the following encounter, which occurs on March 14, 2016, by noting that "LOOSE SCREWS ARE NOT THAT PAINFUL."[19]

71. On Encounter 12, occurring on May 2, 2016, RESK provides SF with a prescription for ninety-nine (99) oxycodone 30 mg which was intended to supply SF for thirty-three (33) days.

72. Encounter 13, which occurred on May 20, 2016, (eighteen (18) days after SF received a thirty-three (33) day supply of oxycodone) resulted in SF obtaining a 30 day supply of 30 mg oxycodone. RESK notes that the she (RESK) spoke to SF after SF complained that a pharmacy would not fill the prescription.[20] RESK notes that SF was informed that SF would be terminated as a patient of RESK's both verbally on the phone and also by a letter that RESK sent.

73. RESK provided a letter to DHP which was dated May 22, 2016, and addressed to SF and states the following:

> *Dear [SF]:*
> *Please consider this a formal discharge from my medical practice. You have thirty days in which to find another physician from the date above.*
>
> *You have a prescription for pain pills in hand which will suffice until July 2016. The prescription calls for three pills per day and not four pills per day. Your constant*

---

[18] DHP Case 175141 pg. 120
[19] DHP Case 175141 pg. 125
[20] PMP data shows that the prescription for ninety (90) oxycodone 30 mg prescribed on May 20, 2016 was filled on June 2, 2016.



*failure to follow directions has reached the end. There can be no further excuses for taking too many pain pills. I will not cover your mistakes, errors or abuse of a controlled substance.*

*I will be happy to take care of you for thirty days from the date of this letter for matters not relating to pain meds. All care must be paid in advance and in cash.*

*I wish you the best of luck in you medical care. Follow directions on the prescription bottle and do not abuse any drug. It may cost you your life!* [21]

74. Encounter 14, occurring on July 1, 2016, makes no note of SF's dismissal. Encounter 15 also shows a date of July 1, 2016, and notes that SF returned humbled and with more medical records. SF, per PMP data, had a prescription for ninety (90) oxycodone 30 mg filled, which was prescribed by RESK on July 1, 2016. RESK continues to prescribe oxycodone to SF for approximately six months after informing SF that she (SF) would no longer receive pain medication from RESK. The majority of RESK's notations for the final three or four encounters with SF appear to be identical.

75. PMP data shows that SF filled prescriptions for oxycodone, prescribed by RESK on October 3, 2016, November 2, 2016, and December 2, 2016. RESK noted encounters for the October and December prescriptions. Encounter 18 and 19 are dated October 3, 2016. Encounter 19 notes:

> i. "PATIENT REQUEST FOR A REFILL OF HER PRESCRIPTION WRITTEN ONE WEEK AGO AND APPARENTLY STOLEN WAS REFUSED. SHE WAS INFORMED THAT SHE MUST TAKE CARE OF HER CONTROLLED SUBSTANCE MEDS. SHE HAS A HISTORY OF MISUSING/OVERUSING MEDS." [22]

76. Encounter 20, dated October 31, 2016 note seems identical to Encounter 19 with a small addition:

[21] DHP Case 175141 pg. 160
[22] DHP Case 175141 pg. 152

i. "PT'S REQUEST FOR A REFILL OF HER PRESCRIPTION WRITTEN ONE WEEK AGO AND APPARENTLY STOLEN WAS REFUSED. SHE WAS INFORMED THAT SHE MUST TAKE CARE OF HER CONTROLLED SUNSTANCES MEDS. SHE HAS A HISTORY OF MISUSING/OVERUSING MEDS.
SHE WAS TOLD THAT SHE WOULD HAVE TO DO WITHOUT MEDS AS SHE HAS BEEN INFORMED PREVIOUSLY ABOUT HANDLING OF HER MEDS. SHE AGREED RELUCTANTLY."[23]

77. Again, SF obtained a prescription for oxycodone on November 2, 2016.

78. Encounter 21, dated December 2, 2016, and is the last record provided by RESK. SF is again prescribed oxycodone and notes that RESK encouraged SF to gain a membership at a gym such as Planet Fitness.

79. It should be noted that the Encounters that RESK provided DHP during this investigation appear to be electronically generated. CS 1 though, in his/her attempt to obtain his/her patient records was hampered by a malfunction of RESK's copier. RESK did not mention or offer to print records that RESK had maintained electronically.

### 6701 Back Creek Road

80. Through the course of this investigation, this affiant learned that the barn utilized by RESK to perform manipulations in, also contains an apartment. This apartment is believed to be vacant and would be a likely place for storage due to its vicinity to the offices which RESK used in the barn to conduct manipulations and its closeness to the main house on the property.

81. Also, DHP case number 169884 was established after a complaint that DM was a romantic partner of RESK while DM obtained prescriptions for oxycodone from RESK. PMP data shows that DM provided 6701 Back Creek Rd, Boones Mill, VA as her address for two oxycodone

---

[23] DHP Case 175141 pg. 155

prescriptions and one hydrocodone prescriptions between July 29, 2015 and September 21, 2015 which had been prescribed by RESK.

## APPLE BRAND DEVICES

82. In my training and experience, it is likely that the Target Premises will contain at least one Apple brand device, such as an iPhone or iPad, because of financial records showing purchases made from the Apple Store and from Apple iTunes.

83. I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

84. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

85. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID

also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

86. The passcode or password that would unlock the Apple device(s) found during the search of the Target Premises is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of the Apple device(s) found during the search of the Target Premises to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

87. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a Target Premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the Subject Target Premises to press their finger(s) against the Touch ID sensor of the locked Apple device(s) found during the search of the Subject Target Premises in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

88. Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the Apple device(s) found in the Target Premises as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

22

89. Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Target Premises to the Touch ID sensor of the Apple brand device(s), such as an iPhone or iPad, found at the Target Premises for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

## COMPUTERS AND ELECTRONIC STORAGE MEDIA

90. As described above and in Attachment B, this application seeks permission to search and seize certain records and evidence of the target offenses that might be found at the TARGET PREMISES, in whatever form they are found. I submit that if a computer, thumb drive, or other electronic storage medium is found at the TARGET PREMISES, there is probable cause to believe those records may be stored in that computer or other electronic storage media, for at least the following reasons:

91. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using readily-available forensics tools. This is so because when a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.

92. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the hard drive that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

93. Similarly, files that have been viewed via the Internet are typically automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed

amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

94. In this case, the warrant application requests permission to search for and to seize a variety of records, including drug/medication purchases, drug transaction records, patient/recruit records, scheduling and travel records, and financial transactions, including those that may be stored on a computer. These things constitute evidence of the crimes being committed. From my training and experience, I believe that a computer can be used to store records or information relating to a crime of this type such as the items described in Attachment B, as well as notes as to how the criminal conduct was achieved, records of Internet discussions about the crime, and other records that indicate the nature of the offense.

95. Based upon my knowledge, training and experience, I know that searching for information stored in computers often requires agents to seize most or all electronic storage devices to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is often necessary to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine those storage devices in a laboratory setting, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the laboratory setting. This is true because of the following:

a.   The volume of evidence.  Computer storage devices (like hard disks or CD-ROMs) can store the equivalent of millions of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files constitute evidence or instrumentalities of crime.  This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

b.   Technical requirements.  Searching computer systems for criminal evidence sometimes requires highly technical processes requiring expert skill and properly controlled environment. The vast array of computer hardware and software available requires even computer experts to

24

specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis.

96. In light of these concerns, I hereby request the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described.

97. Searching computer systems for the evidence described in Attachment D may require a range of data analysis techniques. In some cases, it is possible for agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide files and directories, encode communications to avoid using key words, attempt to delete files to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or peruse every file briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your affiant intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

## AUTHORIZATION REQUEST

98. The facts related to the investigation contained in this affidavit are limited and for the sole purpose of setting forth information to establish the probable cause to believe that federal criminal violations, including possession with the intent to distribute a controlled substance (namely oxycodone) in violation of Title 21, United States Code, Section 841(a)(1) and money

laundering in violation of Title 18, United States Code, Section 1956(a)(1) and 1956(h) have been committed, and that there is probable cause to believe that RESK has used businesses, including To Life!, and associated banking accounts in concert to further the previously described criminal schemes.

99. Based on the information contained in this affidavit, I believe that the search of RESK's residential property, including the house, the apartment, the curtilage, adjacent property, as well as barns, buildings and vehicles thereon, and RESK's former business property, will glean evidence, fruits, and instrumentalities of the aforementioned crimes, as well as to the identification of individuals who are engaged in the commission of those crimes.

100. It is requested that the warrant, application, and accompanying affidavit be sealed until further order of the Court in order to avoid premature disclosure of the investigation and to better ensure the safety of agents and others participating in the investigation, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office, and may be served by Special Agents and other investigators of the United States Drug Enforcement Administration, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.

101. WHEREFORE, based on the foregoing, your Affiant requests that the Court issue warrants authorizing the search of residential property, located at 6700 Back Creek Rd. Boones Mill, VA 24065, 6701 Back Creek Rd. Boones Mill, VA 24065, and business located at 5303 Clearbrook Village Ln. Roanoke, VA. 24112, all found within the Western District of Virginia, within 10 calendar days of the issuance of the requested warrant.

*[signature]* 6/26/2018

David S. Clements

Task Force Officer

Drug Enforcement Administration

Sworn to and subscribed before me this _26_ day of June, 2018.

UNITED STATES MAGISTRATE JUDGE

WESTERN DISTRICT OF VIRGINIA